UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

MICHAEL GIGANTI
                              Plaintiff,

                                                        **MEMORANDUM & ORDER**
                 v.                                     12-CV-1210 (PKC) (ARL)

POLSTEAM SHIPPING CO. and
CSC SUGAR, LLC,

                              Defendants.

-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

  In this maritime case, Plaintiff Michael Giganti ("Plaintiff"), a longshoreman, slipped and

fell while discharging sugar from the M/S PILICA ("PILICA" or the "Vessel").  He brings this

negligence action against Defendants Polsteam Shipping Co. ("Polsteam"), the owner *pro hac*

*vice* of the Vessel, and CSC Sugar, LLC, the charterer of the Vessel, ("CSC") (collectively, the

"Defendants") under the Longshore and Harbor Workers' Compensation Act ("LHCWA"), 33

U.S.C. § 905(b).

  Defendants' individually move for summary judgment, each arguing that there is no

evidence in the record to support a finding that it breached its duties of care causing injury to

Plaintiff.

  For the reasons set forth below, the Court GRANTS Defendants' respective motions for

summary judgment.  Accordingly, this case is dismissed.

## BACKGROUND

### I.     Relevant Facts

For the purposes of the instant motion, the Court accepts undisputed facts as true and resolves disputed facts in favor of the Plaintiff where there is evidence to support his allegations.[1]

### A.     The Actors

This action arises out of an injury sustained by Plaintiff on March 31, 2011, while working aboard the PILICA, a vessel owned *pro hac vice* by Polsteam.  (Pol. 56.1 ¶¶ 1, 3.)[2] Plaintiff is a longshoreman, who has been employed by non-party American Sugar Refining Inc. ("ASR") since September 2007.  (CSC 56.1 ¶ 1.)[3]  At the time of the injury, the PILICA was under charter of Defendant CSC and docked at a terminal on the Hudson River, owned by ASR. (*Id.* ¶¶ 2, 10.)[4]

Defendant CSC is a trading house, which trades primarily in sugar.  (*Id.* ¶ 9.)  On March 7, 2011, Polsteam, as owner *pro hac vice*, and CSC as charterer, entered into a time charter party ("Time Charter").  (*Id.* ¶ 11.)   Under the terms of the Time Charter, CSC hired the PILICA for a

---

[1]     The Court construes any disputed facts in the light most favorable to Plaintiff, as the non-moving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970).  However, where Plaintiff either (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in either Defendant's Local Rule 56.1 Statement, this Court shall deem any such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)-(d) ("56.1 Statement").  A standalone citation to a 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citations to a party's 56.1 Statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to underlying documents.

[2]     "Pol. 56.1" refers to Defendant Polsteam's 56.1 Statement."  (Dkt. 44-1.)

[3]     "CSC 56.1" refers to Defendant's CSC's 56.1 Statement (Dkt. 35 ¶¶ 1-32), and its 56.1 Response Statement (Dkt. 47 ¶¶ 33-47.)

[4]     It is undisputed that the PILICA was in navigable waters of the United States.  (Pol. 56.1 ¶ 2.)  No party has raised an objection to this Court's jurisdiction.

single trip from the Dominican Republic to the United States' east coast to transport a cargo of bulk sugar, which CSC had sold to ASR.  (*Id.*)  The terms of CSC's sale to ASR provided that ASR, or its designee, would be responsible for discharging the bulk sugar cargo from the vessel. (*Id.* ¶ 12.)

ASR operates a marine terminal located at 1 Federal Street, Yonkers, New York, the site of the incident at issue (the "Terminal").  (*Id.* ¶¶ 2.)  Vessels call at the Terminal at least once per week to discharge bulk sugar, *i.e.*, sugar that is not packaged but is transported loose inside the holds of the vessel.  (*Id.* ¶¶ 3-4.)  Equipment used at the Terminal during vessel discharge operations includes two floating cranes and at least five track loaders.  (*Id.* ¶ 6.) The floating cranes are typically moored next to the Terminal's dock and vessels berth alongside these cranes. (*Id.* ¶ 7.)  The track loaders are used inside the holds of the vessels by longshoremen to pile up sugar from the bottom of the hold so that the cranes can access it to lift it off the vessels with clamshell grabs.  (*Id.*)  ASR, acting as a stevedore,[5] operates and maintains the equipment used during discharge.  (*Id.* ¶ 6.)

ASR employs the longshoremen, including Plaintiff, who discharge sugar from vessels calling at the Terminal, and the dock manager who supervises those longshoremen.  (*Id.* ¶ 5.) Plaintiff's specific job duties included boarding vessels to service and repair the engines of the discharging equipment.  (*Id.* ¶ 8.)

B.  The Incident

On March 25, 2011, pursuant to the parties' agreements, the PILICA berthed at ASR's Terminal to begin discharge of its raw sugar cargo.  (Pol. 56.1 ¶¶ 5, 7.)  The cargo discharge was

---

[5]        "A stevedore is a marine contractor who loads and unloads ships in port."  *Lubrano v. Waterman Steamship Co.*, 175 F.3d 274, n. 1 (2d Cir. 1999).

3

scheduled to take place from March 25, 2011 to March 31, 2011.  (*Id.* ¶ 5.)  The stevedore, ASR,

conducted the cargo discharge operations pursuant to the terms of CSC's sale of sugar to ASR.

(Pol. 56.1 ¶ 6; CSC 56.1 ¶ 12.)

On March 31, 2011, the day of the incident in question, longshoremen employed by ASR

were discharging sugar from the PILICA at the Terminal using floating cranes and track loaders.

(CSC 56.1 ¶ 15.)  Early that morning, "light rain" began to fall.  (Pltf. Resp. Pol. 56.1 ¶ 23.)[6]

Bulk sugar is susceptible to damage if wetted.  (CSC 56.1 ¶ 19.)   The PILICA's general policy

is not to discharge when rain is failing because the vessel is responsible for any damage to the

cargo.  (Pol. 56.1 ¶ 14.)  Discharge operations halted due to the rain but recommenced after ASR

provided a "Rain Letter."  (Karas Tr. 64, 120-121.)[7]  The Rain Letter is a letter of indemnity,

which insulates the vessel from liability for any damage to cargo resulting from discharge during

adverse weather conditions.  (CSC 56.1 ¶ 20.)

Clause 84 of the Time Charter ("Clause 84") gave CSC the option to allow discharge

during rain periods provided that CSC, as the charterer, and ASR, as receivers of the cargo,

furnished Polsteam with the Rain Letter.  (Pol. 56.1 ¶ 16.)  ASR drafted and signed the Rain

Letter, which CSC countersigned.  (Pol. 56.1 ¶ 18; CSC 56.1 ¶ 22.)  The Rain Letter concerned

responsibility for cargo damage during discharge of cargo in rainy conditions; it did not concern

the safety of longshoremen or potential liability resulting therefrom.  (CSC 56.1 ¶ 23-24.)

After discharge recommenced on March 31, 2009, at approximately 1:30 p.m., Plaintiff

boarded the Vessel to repair a track loader that was being used in one of the PILICA's hatches to

---

[6]      "Pltf. Resp. Pol." refers to Plaintiff's 56.1 Statement in Response to Defendant
Polsteam's 56.1 Statement.  (Dkt. 49-1.)

[7]      "Karas Tr." refers to the transcript pages of deposition testimony given by Captain Pawel
Karas on April 16, 2013.  (Dkt. 43-13.)  It is attached as Exhibit M to the Declaration of Robert
A. Suarez In Support of Motion for Summary Judgment (Dkt. 43) ("Suarez Decl.").

assist in the discharge.  (Giganti Tr. 47-48.) [8]  At that time it was raining lightly.  (CSC 56.1 ¶ 27(b).)  Plaintiff claims he slipped on a mixture of rainwater and raw sugar present on the Vessel's starboard side, striking his tailbone on the deck.  (Pltf. Resp. Pol. 56.1 ¶ 24; CSC 56.1 ¶ 27(c).)  Prior to his fall, Plaintiff saw rainwater but no sugar on the deck where he fell.  (CSC 56.1 ¶ 27(d).)  After he fell, Plaintiff saw that he had slipped on a clear liquid that was dripping from one of the Vessel's hatch cover drain valves onto the deck.  (*Id.* ¶ 27(e).)  Plaintiff claims that the liquid mix dripped from the drain pipe valve onto the deck and then ran across the deck.  (Pltf. Resp. Pol. 56. 1 ¶ 25; CSC 56.1 ¶ 27(f).)  The PILICA's deck was not coated with "grit" or sand.  (Pltf. Resp. Pol. 56. 1 ¶ 27.)

Earlier that day, Patrick Romeo, an ASR stevedore and Plaintiff's colleague, observed a liquid substance dripping from the hatch over the drain valve onto the deck and notified a member of the Vessel's crew of such condition as he was leaving the Vessel to take his lunch break.  (CSC 56.1 ¶ 28.)  When he returned from his lunch break, the dripping liquid was still present at the same spot, the site where Plaintiff later fell.  (*Id.*)  After Plaintiff's fall, a member of the Vessel's crew capped the valve.  (*Id.*)

C.  Sugar Discharge at the Terminal

The only type of cargo that is discharged at ASR's Terminal is bulk sugar.  (Carlucci Tr. 32).[9]  Cargo ships call on the Terminal at least once per week.  (CSC 56.1 ¶ 3.)  Plaintiff is typically required to be at the Terminal to work any time discharge operations occur.  (Giganti Tr. 35.)

---

[8]     "Giganti Tr." refers to the transcript of the deposition testimony given by Plaintiff Michael Giganti on August 16, 2013.  (Dkt. 36-1.)  It is attached as Exhibit I to the Suarez Decl.

[9]     "Carlucci Tr." refers to the transcript of deposition testimony given by Michael Carlucci on April 17, 2013.  (Dkt. 43-12.)  It is attached as Exhibit L to the Suarez Decl.

According to ASR longshoremen Carlucci and Romeo, sugar on the deck of a vessel is a common condition that longshoremen expect to—and do—commonly encounter during the discharge of bulk sugar.  (Carlucci Tr. 32-34; Romeo Tr. 127.)[10]  It is also common for sugar residue to get into the drainage channel of the cargo hatch during discharge of bulk sugar cargo.  (Pltf. Resp. Pol. 56. 1 ¶ 19.)  According to Plaintiff, "[w]hen light rain occurs during discharge operations involving bulk raw sugar, it is common for it to mix with any sugar in the drainage channel, drain into the adjacent drainage pipe, and start draining onto the deck."  (*Id.* ¶ 20.)

D.  The Division of Responsibilities

Under the terms of its contract of sale with CSC, ASR was responsible for discharging cargo from the Vessel.  (CSC 56.1 ¶ 12.)  ASR employed the longshore workers, including Plaintiff that discharged sugar from the PILICA.  (Pol. 56.1 ¶ 11.)  Discharge took place at ASR's Terminal, using ASR's equipment.  (CSC 56.1 ¶¶ 2, 6.)

Captain Pawel Karas ("Capt. Karas"), a Polsteam employee, made hourly inspections from 8:00 a.m. to 4:00 p.m. on March 31, 2011, to gauge progress and determine if there was any damage on the deck or in the holds of the Vessel.  (CSC 56.1 ¶¶ 25-26; Pltf. CSC Resp. 56.1 ¶¶ 25-26.)[11]  Capt. Karas served as a liaison with the stevedores at ASR's terminal during discharge.  (CSC 56.1 ¶ 17.)  Capt. Karas testified that ASR carried out the discharge operation, and that he worked with ASR's dock manager, Walter Opak, in that regard.  (CSC 56.1 ¶ 18.)  Capt. Karas did not work with anyone from CSC in connection with the discharge.  (*Id.*)

Capt. Karas was alerted to Plaintiff's fall at about 1:40 p.m., after which Capt. Karas went to the site of the accident.  (CSC 56.1 ¶ 29; Pltf. Resp. CSC ¶ 29.)  Capt. Karas testified that

---

[10]    "Romeo Tr." refers to the transcript pages of deposition testimony given by Michael Carlucci on April 17, 2013.  (Dkt. 43-11.)  It is attached as Exhibit K to the Suarez Decl.

[11]    "Pltf. Resp. CSC" refers to Plaintiff's Rule 56.1 Response to Defendant CSC's motion 56.1 Statement.  (Dkt. 51-1.)

he did not notice any substance other than water on the deck.  (CSC 56.1 ¶ 30.)  Others aboard the Vessel testified that the rainwater/sugar mix was observable and avoidable and that a wet deck is a common occurrence on a vessel.  (Pol. 56.1 ¶¶ 13, 26.)

Polsteam did not perform cargo discharge operations, nor did it supervise ASR's cargo discharge.  (*Id.* ¶ 9.)  CSC did not employ, hire or supervise the crew of the PILICA.  (CSC 56.1 ¶ 13.)  It did not man, operate, maintain, repair or navigate the PILICA.  (*Id.*)  No CSC personnel were aboard the Vessel or at the Terminal at any time during the vessel's discharge.  (*Id.* at 14.)

## II.     Procedural Background

Plaintiff commenced this action in Suffolk County Supreme Court, which Polsteam later removed to this court in March 2012.[12]  "Although it was never filed with the court … in September [2012], Giganti served the parties with an amended complaint adding CSC."[13]  CSC filed an answer to the (second) amended complaint in October 2012 and was subsequently added as a party to this action.[14]  (Judge Lindsay's June 10, 2013 Report & Recommendation ("R&R") ("Dkt. 26").)

On April 21, 2013, Plaintiff moved to amend his complaint again, this time seeking to add: (i) an allegation that he was a longshoreman; (ii) causes of action against the Defendants under the LHCWA, 33 U.S.C. ¶ 905(b), and the Jones Act, 46 U.S.C. § 3104; and (iii) a cause of

---

[12]     Plaintiff initially commenced this action against Biehl & Co. Inc. Suffolk County Supreme Court in 2011.  In January 2012, Plaintiff discontinued his action against Biehl & Co. Inc. and substituted Polsteam.

[13]     This complaint was Plaintiff's second amended complaint.  (Dkt. 10; Order dated August 9, 2012 granting Giganti leave to file a second amended complaint adding CSC as a defendant.)

[14]     CSC was officially added as a party on July 2, 2013, when this Court adopted Judge Lindsay's R&R.

action against the Defendants based on the Vessel's unseaworthiness.[15]  (Dkt. 20.)  On June 10,

2013, Magistrate Judge Lindsay submitted to this Court an R&R, which, *inter alia*, found that

Plaintiff was a longshoreman, not a seaman.  Therefore, she recommended that Plaintiff could

properly amend to bring a LHCWA claim; however, because the Jones Act permits only actions

by seamen, and because unseaworthiness claims are not viable under the LHCWA, she found

that an amendment to add such claims would be futile.[16]  (Dkt. 26.)

On June 25, 2013, after clear error review of the R&R and relevant case law,[17] and in the

absence of objections from Plaintiff, this Court adopted Judge Lindsay's R&R in its entirety

pursuant to 28 U.S.C. § 636(b)(l).  Plaintiff filed, on July 10, 2013, his (third) amended

complaint, in accordance with this Court's order.  On September 6, 2013, Defendants filed their

motions for summary judgment as to Plaintiff's (third) amended complaint.  These motions are

before the Court.

### *DISCUSSION*

### III.    Summary Judgment Standard of Review

Summary judgment is proper only where, construing the evidence in the light most

favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of*

---

[15]     CSC opposed as futile Plaintiff's motion to add claims under the Jones Act and general
maritime law regarding seaworthiness, but did not object to Plaintiff identifying himself as a
longshoreman and adding a claim under the LHCWA, 33 U.S.C. ¶ 905(b).  (Dkt. 23.)  Polsteam
did not respond to the motion.  (Dkt. 26 at 1.)

[16]     *See* Dkt. 26 at 5-7 for Judge Lindsay's analysis supporting these conclusions.

[17]     An injured longshoreman may sue a third party for negligence.  §933(a); *see also Gravatt
v. City of New York*, 226 F.3d 108, 115.  However, "[o]nly seamen are 'entitled to sue for
damages under the Jones Act." *O'Hara*, 294 F.3d at 63.  And under the LHCWA, a
longshoreman may sue a shipowner for negligent conduct only; seaworthiness claims are
impermissible. *See Scindia*, 451 U.S. at 156.

*Parole,* 678 F.3d 166, 173-74 (2d Cir. 2012).  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The substantive law identifies "which facts are material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation omitted).

This standard imposes the initial burden on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial.  *Id.* at 324*; see also Anderson*, 477 U.S. at 256-57.   The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [their] version of the events is not wholly fanciful."  *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (collecting cases).

## IV.   The LHCWA and *Scindia* Duties

"The shipowner, longshoreman and stevedore form a tripartite legal triangle that is governed by the [LHCWA]."  *Conenna v. Loyal Chartering Corp.*, 98-CV-7402 (DGT), 2003 WL 255947, at *4 (E.D.N.Y. Feb. 5, 2003).  "Prior to 1972, under the terms of the LHWCA employees of stevedores 'not only … were entitled to compensation benefits [under the LHWCA], they [also] could recover from vessel owners under the doctrine of unseaworthiness."  *DeBiase v. Cat Island Shipping, Ltd.*, 07-CV-3057 (JG), 2009 WL 3077193, at *4 (E.D.N.Y.

Sept. 25, 2009) (citation and quotation marks omitted).  However, beginning with the 1972 amendments, and as modified since, the LHWCA establishes a no-fault workers' compensation scheme whereby an injured longshoreman is entitled to compensation for work-related injuries. *See O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 62 (2d Cir. 2002) (citing *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 96, (1994)).  "The injured longshoreman's employer—in most instances, an independent stevedore—must pay the statutory benefits regardless of fault, but is shielded from any further liability to the longshoreman."  *Howlett*, 512 U.S. at 96 (citation omitted).

However, an injured longshoreman may bring a negligence action against a third party— "typically the owner or charterer of the vessel on which he or she sustained the injury for negligence." *O'Hara*, 294 F.3d at 62.  Specifically, § 905(b) of the LHCWA permits that "[i]n the event of injury to a person covered under this Act caused by the negligence of a vessel … such person … may bring an action against such vessel as a third party."  33 U.S.C. § 905(b). However, underlying this scheme, and informing the duties imposed on each party in the triangle, is the general principle that a "shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards."  *Scindia Steam Nav. Co., Ltd. v. De Los Santos*, 451 U.S. 156, 170 (1981).

The LHWCA does not define what conduct or omissions constitute negligence for the purpose of actions against third-party vessel owners under § 905(b).  *O'Hara*, 294 F.3d at 64. However, the Supreme Court filled that void in *Scindia*, as refined by *Howlett*, articulating "common-law standards to guide judicial determinations of liability" on § 905(b) actions. *O'Hara*, 294 F.3d at 64 (citing *Scindia*, 451 U.S. at 165-78); *see also Howlett*, 512 U.S. at 92. These "*Scindia* duties" establish three different duties of care a shipowner owes longshoremen

10

working on its vessel: "(1) the "turnover duty," which "relates to the condition of the ship upon the commencement of stevedoring operations"; (2) the "active control" duty, which applies once stevedoring operations have begun and provides that, where the vessel retains "active control," a shipowner "must exercise reasonable care to prevent injuries to longshoremen"; and (3) the "duty to intervene," which clarifies a vessel's duty should it obtain knowledge of both an obviously unsafe condition and the stevedore's failure to tend to such condition. *Howlett*, 512 U.S. at 98 (citing *Scindia*, 451 U.S. at 167).

## V.     Defendants' Motions for Summary Judgment

Plaintiff's claim against each Defendant arises under § 905(b) of the LHCWA.[18] Defendants concede that Plaintiff is a "covered employee," *i.e.,* a longshoreman, as defined by § 905(b).  Defendants also concede that as the owner *pro hac vice* of the vessel and the charterer of the vessel, respectively, they are appropriate third-party defendants under § 905(b). *See also* § 33 U.S.C. § 902(21); *O'Hara*, 294 F.3d at 62.

Defendants move for summary judgment, however, because each contends that it did not breach its respective *Scindia* duties owed to Plaintiff.  Plaintiff, for his part, contends that each Defendant breached all three of its applicable duties.

These motions take place entirely within the *Scindia* framework.

### A.  The Turnover Duty

The turnover duty has two components, which may be described as a primary 'duty to take ordinary care' and a corollary 'duty to warn.' *See, e.g.*, *DeBiase*, 2009 WL at *5.  The

---

[18]     33 U.S.C. § 905 provides in pertinent part: "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person … may bring an action against such vessel as a third party."  The term "vessel," as used in § 905(b), includes, *inter alia*, the owner *pro hac vice* of the vessel as well as the charterer of the vessel.  33 U.S.C. § 902(21); *see also O'Hara*, 294 F.3d at 62; *Barnett v. Howaldt*, 757 F.2d 23, 25-26 (2d Cir. 1985) (noting the term "charter" in § 905(b) applies to the time charterer of a vessel).

primary duty requires that a vessel must surrender the ship "in such condition that an expert and experienced stevedoring contractor, *mindful of the dangers he should reasonably expect to encounter* … will be able by the exercise of ordinary care" to carry out his operations with reasonable safety. *Howlett*, 512 U.S. at 98 (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404 (1969) (internal quotation marks omitted); *see also Gravatt v. City of New York*, 226 F.3d 108, 120-21 (2d Cir. 2000). The corollary duty requires vessels to warn stevedores or other contractors of hazards that are "known to the vessel or should be known to it in the exercise of reasonable care" and which are "not known … and would not be obvious" to the stevedore "if reasonably competent in the performance of his work." *Howlett*, 512 U.S. at 99. The vessel must provide a longshoreman with an area free from "unreasonable hazards"; however, "[t]here is no duty to turn over an absolutely safe vessel." *Sinagra v. Atlantic Ocean Shipping*, 182 F. Supp. 2d 294, 300 (E.D.N.Y. 2001).

### 1. *CSC's Turnover Duty*

Plaintiff argues that CSC breached its turnover duty because it chartered the PILICA and the PILICA did not have slip resistant grit in the paint on its deck. (Pl. Mem. Opp. CSC ("Dkt. 51") ¶¶ 52-54). This contention fails for at least three reasons.

First, CSC never had control of the Vessel, and therefore did not have the ability to surrender the ship in a safe condition, or any other condition for that matter. *See, e.g., Howlett*, 512 U.S. at 99 (describing the conditions under which the vessel must "turn over" the ship); *Sinagra*, 182 F. Supp. 2d at 300 (noting that the vessel is expected to exercise ordinary care in "surrendering" its equipment). Second, under the terms of the Time Charter, Polsteam guaranteed that the vessel possessed all of the necessary certificates required for trading and that such certification would remain valid for the duration of the charter. (Reilly Decl. Ex. 7 at

Clauses 29-30.)[19]  Third, even if CSC had been the shipowner, as discussed below, it would have no duty to resurface the Vessel's deck.  CSC's motion for summary judgment is granted on this issue.

### 2.  *Polsteam's Turnover Duty*

Plaintiff argues that the slippery condition upon which plaintiff fell was "foreseeable" because (1) during discharge of bulk cargo, cargo residue commonly sits in the drainage channel of the cargo hatch; (2) during rain periods, water would mix with sugar in the track of the hatch, and eventually seep onto the deck; and (3) extremely slippery conditions result from the mixture of sugar and rainwater.  (Pl. Mem. in Opp. Pol. ("Dkt. 50") ¶ 44.)  In light of these conditions, Plaintiff argues "sufficient evidence exists to create a genuine issue of material fact as to whether the deck [of the Vessel] … should have been coated with paint containing grit for traction … and whether the drain valves should have been capped …." (Dkt 50 ¶ 46.)  Plaintiff further contends that, under the circumstances alleged in this case, Polsteam should have warned the ASR longshoremen about the potentially slippery condition or the factors that contributed to it.  (Dkt. 50 ¶ 47.)

As an initial matter, nothing in the record suggests that the Vessel's deck was in a slippery or otherwise hazardous condition when cargo operations *commenced* on March 25, 2011.  *See Howlett*, 512 U.S. at 92 (holding that the turnover duty "relates to the condition of the ship upon commencement of stevedoring operations"); *Sinagra*, 182 F. Supp. 2d at 300.  Perhaps in recognition of this critical omission, Plaintiff argues that his injury was "foreseeable."  (Dkt. 50 ¶ 44.)  However, this argument is inapposite; the turnover duty "confines itself to the

---

[19]     "Reilly Decl." refers to the Mary Reilly's Declaration In Support of CSC's Summary Judgment Motion.  (Dkt. 36.)  Exhibit 7 attached thereto is a copy of the Time Charter.  (Dkt. 36-7.)

condition of the vessel at the time the stevedore embarks upon its operation." *Sinagra*, 182 F. Supp. 2d at 300; *see also Howlett*, 512 U.S. at 98 (citing *Scindia*, 451 U.S. at 167).

Even assuming, *arguendo*, there were no temporal bar to Plaintiff's claim, the record is rife with evidence that a competent stevedore should have expected to encounter, and could have avoided, a mixture of sugar and water on the Vessel's deck. Water mixing with sugar is a condition that longshoremen, particularly those who, like Plaintiff, *specialize in the discharge of sugar from cargo ships*, can reasonably expect to, and in fact do, frequently encounter. (*See*, *e.g.*, Carlucci Tr. 32-34; Romeo Tr. 127.). For example, Michael Carlucci testified that because he is on the Vessel "all the time," he knew to be careful "when it's wet like that, especially [on] that deck." (Carlucci Tr. 47.) Though Carlucci never saw the sugar/rainwater mixture, he was able to avoid slipping just by "being careful in general." (*Id.*). "Indeed, the very fact that the discharging of cargo is carried out by expert and experienced stevedore[s] implies that certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced stevedore could safely work around them." *Sinagra*, 182 F. Supp. 2d at 302 (internal quotation marks omitted).

Plaintiff's claim that Polsteam failed in its corollary 'duty to warn' about slippery conditions carries little weight. "Courts have consistently held … that a slippery deck condition caused by rain … cannot form the basis for a finding of negligence, since in law it does not constitute an unreasonably dangerous working condition." *Anastasiou v. M/T World Trust*, 338 F. Supp. 2d 406, 420-21 (E.D.N.Y. 2004) (quotations omitted) (*citing Zielinski v. Companhia De Navegacao Maritima Netumar*, 460 F. Supp. 1179, 1182 (E.D.N.Y. 1978). Indeed, Plaintiff provides no evidence to suggest that as an experienced maritime worker, he needed to be warned that it might be slippery on the Vessel, "particularly since he was aware of the weather when he

14

boarded the [V]essel." *Anastasiou*, 338 F. Supp. 2d at 421.  Given the regularity with which sugar residue ends up on the decks of vessels during discharge at the ASR Terminal, a warning about the possibility of a slippery rainwater/sugar mixture occurring on the deck is equally unnecessary.

Plaintiff also argues that Polsteam was negligent in failing to coat the deck with paint containing grit for traction or to warn about such failure.  However, "[t]he lack of a non-skid surface [i]s not a hidden condition which would give rise to the vessel owner's duty to warn." *Anastasiou*, 338 F. Supp. 2d at 421 (citing *Davis v. Pan Ocean Shipping Co., Ltd.,* 1999 WL 144095, at *5 (E.D.Pa. 1999) (citing *Thompson v. Cargill, Inc.,* 585 F. Supp. 1332, 1335 (E.D.La. 1984))); *Verret v. Dean Boats, Inc.,* 1989 WL 81274, at *9 (E.D.La. 1989) (same). Longshoremen "frequently perform their work on the decks of vessels which may be devoid of nonskid surfaces.  To allow longshoremen to bring a negligence action against a vessel without non-skid surfaces would be [tantamount] to allowing them to proceed on a theory of unseaworthiness," which is barred by the LHWCA.  *Verret*, 1989 WL 81274, at *9 (citing Thompson, 585 F. Supp. at 1334 n. 1).

For the foregoing reasons, Plaintiff has failed to demonstrate the existence of any genuine issue of material fact with respect to Polsteam's turnover duty.

B.  The Active Control Duty

"[O]nce stevedoring operations have begun, the vessel will be liable 'if it *actively involves* itself in the cargo operations and negligently injures a longshoreman.'" *Gravatt*, 226 F.3d at 121 (emphasis in original) (quoting *Scindia,* 451 U.S. at 167.)  "A passive vessel owner has no ongoing duty to supervise or inspect the stevedore's work-absent contractual, regulatory or customary obligations to the contrary."  *Id.* (emphasis in original) (citing *Scindia,* 451 U.S. at

15

172.)  "However, even where the vessel does not actively involve itself in the stevedoring

operations, it may be liable 'if it fails to exercise due care to avoid exposing longshoremen to

harm from hazards they may encounter in areas, or from equipment, under the *active control of*

*the vessel* during the stevedoring operation.'"  *Id.* (*Scindia,* 451 U.S. at 167.)  "Therefore, the

vessel must take care to prevent unreasonable hazards in areas of the vessel under its direct

control."  *Id.* at 121.  These related obligations, arising from either the vessel's "active

involvement" in cargo operations or its "active control" of areas of the vessel encountered by

longshoremen, together make up the "active control duty."  *Id.*

### 1. *CSC's Active Control Duty*

Plaintiff concedes that CSC did not own, operate or maintain the PILICA or its

equipment.  CSC did not employ or supervise the crew of the PILICA.  No CSC personnel were

at the Terminal or aboard the Vessel.  For these reasons, among others, it is abundantly clear that

CSC did not "actively involve" itself in cargo operations.  *See Gravatt*, 226 F.3d 108, 121.

Grasping for straws, Plaintiff argues that by countersigning the Rain Letter, CSC

assumed active control "over whether work would be allowed to proceed in the rain on the date

of Plaintiff's accident."  (Dkt. 51 at 17-19.)  This argument is meritless.  ASR controlled the

discharge.

The contract of sale between CSC and ASR required ASR to discharge the vessel.  (CSC

56.1 ¶ 12.)  The undisputed testimony reflects that ASR, not CSC, made the decision to

discharge on the day of Plaintiff's accident.  (Berrios Tr. 144-145.)[20]  In fact, ASR commonly

discharged in rainy conditions at the Terminal.  (Carlucci Tr. 78.).  Over the course of CSC's

relationship with ASR, ASR frequently issued the same form rain letter.  (Berrios Tr. 141-42.)

---

[20]    "Berrios Tr." refers to a copy of the transcript of the March 12, 2013 deposition of Jose
Berrios, attached as Exhibit 4 to the Reilly Decl.  (Dkt. 36-4.)

ASR held the power, which it had exercised at the Terminal in the past, to halt stevedoring operations for weather related safety reasons.  (Romeo Tr. 37.)  CSC, on the other hand, had no obligation to supervise or inspect the stevedores, nor did it ever undertake to do so.  *See Scindia* 451 U.S. at 172.

In any event, Plaintiff has not demonstrated how the Rain Letter, which dealt with liability for cargo damage during discharge in rainy conditions, could constitute active involvement or control of the discharge operations.  (*See* CSC 56.1 ¶ 23-24.)  Summary judgment is granted for CSC on this issue.

### 2.   *Polsteam's Active Control Duty*

There is no evidence that Polsteam actively involved itself in the stevedoring operations. It is undisputed that Polsteam did not conduct, supervise or direct the discharge of sugar at ASR's terminal.  (Pol. 56.1 ¶¶ 6, 9.)  In fact, Plaintiff concedes that the Vessel "did not perform cargo discharge operations; rather, the stevedore, [ASR] conducted cargo discharge operations. (Pol. 56.1 ¶ 6; Pltf. Resp. Pol. ¶ 6.)  Instead, Plaintiff argues that Polsteam breached its active control duty because the PILICA remained under Polsteam's active control and Polsteam *knew or should have known* of the "dangerous" condition that caused Plaintiff's slip.  (Dkt. 50 ¶¶ 55-56.)  Specifically, Plaintiff asserts, Polsteam had knowledge of the subject condition because (1) Romeo alerted a member of Polsteam's crew, (2) the slippery condition was foreseeable, and (3) Capt. Karas should have noticed the subject condition during his hourly inspections.  (Dkt. 51 ¶ 56.)

Plaintiff's contentions are inapposite; knowledge is not the touchstone.  The focus of the active control inquiry is on unreasonable hazards in areas of the vessel under its actual *direct control*, not on hazards about which the vessel has actual or constructive *knowledge*.  *Scindia*,

17

451 U.S. at 167 (holding that a vessel may be liable "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.")

The evidence put forth by all parties in this case, including Plaintiff, demonstrates that if any party had a duty to remedy the allegedly dangerous condition, it was ASR. ASR employees performed and controlled the loading operation using ASR-owned and operated equipment, pursuant to an agreement that ASR would be responsible for the discharge. Moreover, Romeo testified that no Polsteam employees were around the site of the accident (Romeo Tr. at 67), negating the argument that the specific "area of the vessel" in which Plaintiff fell was under Polsteam's direct control. *See Gravatt*, 226 F.3d at 121.

Whether or not negligence contributed to Plaintiff's injury, there is no evidence that, under the standards established in *Scindia*, Polsteam breached its duty of care. Summary judgment is granted to Polsteam on this point.

C. The Duty to Intervene

The duty to intervene is an exception to what courts have described as the "generally limited duties imposed on the vessel once operations have begun." *Gravatt v. City of New York*, 226 F.3d at 121. Even if an "obvious danger" is under the principal control of the stevedore, the vessel owner is obligated to intervene "if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk." *Id.* (citing *Scindia*, 451 U.S. at 175-76). If the vessel is aware both of the dangerous condition and the stevedore's failure to protect its employees from that known hazard, the vessel has a "duty to intervene." *Scindia*, 451 U.S. at 175-76; *Howlett*, 512 U.S. at 98; *Gravatt*, 226 F.3d at 121.

18

1. *CSC's Duty to Intervene*

Plaintiff concedes, as he must, that there is no evidence that CSC had actual knowledge of any conditions on the Vessel, let alone the alleged mixture of rainwater and sugar on the deck. No CSC personnel were present on the Vessel or at the Terminal at any time.  Instead, Plaintiff feebly argues that CSC breached its duty to intervene because it had actual knowledge, at the time it signed the Rain Letter, of the rainy conditions and that the PILICA did not have non-skid paint.  Therefore, Plaintiff argues, "these conditions, which CSC had actual knowledge of, culminated into a foreseeably dangerous condition …."  (Dkt. 51 ¶ 67.)

Plaintiff, again, misses the mark.  *Actual knowledge*, not foreseeability, of an unreasonable harm is the key.  Plaintiff has presented no evidence that CSC had actual knowledge of the liquid mixture or the leaking hatch cover valve from which it allegedly fell, and there is no basis to infer that CSC had such knowledge given how far removed CSC was from the cargo operations at the Terminal.  Without knowledge of the allegedly dangerous condition, CSC had no duty to intervene.  *See Scindia*, 451 U.S. at 175-76.  CSC is, therefore, granted summary judgment on this issue.

2. *Polsteam's Duty to Intervene*

Plaintiff claims that Polsteam had actual knowledge of the sugar/water mixture, knew that such condition posed an "unreasonable risk" of harm, and knew that ASR was not exercising reasonable care to protect its employees from the risk caused by the subject condition.  (Dkt. 50 ¶¶ 62-63, 65.)

The Court accepts, for purposes of this motion, that Patrick Romeo told a Polsteam security officer about the slippery condition next to the drain valve, which goes to Polsteam's knowledge of the subject condition.  Whether, as Plaintiff appears to suggest, Romeo's warning

constituted "actual knowledge" that ASR would fail to exercise reasonable care—thus shifting responsibility to Polsteam—is dubious. However, even accepting this contention, the relevant question, as posed in *Scindia*, remains: If Polsteam was aware of the slippery deck condition, "and if there was a jury issue as to whether it was so unsafe that the stevedore should have ceased using it, could the jury have also found that the [subject condition] was so clearly unsafe that [Polsteam] should have intervened and stopped the loading operation …?" *Scindia,* 451 U.S. at 178; *see also DeBiase*, 2009 WL at *11.

The answer is no. In his attempt to demonstrate that Defendants breached the "turnover duty" by failing to "foresee" potential dangers on the ship—which is, in any event, not apropos of any *Scindia* duty—Plaintiff undercuts his own position. Plaintiff's "undisputed facts" demonstrate that the deck condition was not the kind of "unreasonable hazard" that should have prompted the Vessel to halt the discharge operation. Specifically, Plaintiff's allegations, taken together, demonstrate that the rainwater/sugar mixture that occurred on the PILICA is *common* and that a competent longshoreman would anticipate such condition in the performance of his duties. For example, Plaintiff asserts: "It is common for cargo residue to get into the drainage channel of the cargo hatch during discharge of bulk cargo." (Pltf. Resp. CSC. 56.1 ¶ 33.) "When light rain occurs during discharge operations involving bulk raw sugar, it is common for it to mix with any sugar in the drainage channel … and start draining onto the deck." (*Id.* ¶ 34.) And, it is "well-known in the sugar transportation marine industry that sugar, when mixed with rain water, becomes extremely slippery." (*Id.* ¶ 34.) Moreover, Plaintiff and his fellow ASR longshore workers had specific experience discharging the Vessel at the Terminal, and knew or should have known to anticipate sugar on the deck. (Carlucci Tr. 32-34; Romeo Tr. 127.)

20

Plaintiff has not met his burden of demonstrating a genuine dispute of facts regarding Polsteam's alleged duty to intervene that would require trial.  Polsteam is granted summary judgment on this issue.

### CONCLUSION

A cognizable negligence claim requires a showing that a defendant's alleged breach of its duty of care proximately caused the plaintiff's injuries.  Plaintiff having failed to demonstrate that there is a genuine issue of material fact as to whether either Defendant breached any *Scindia* duty owed to him, Defendants' respective motions for summary judgment are granted in their entirety. The Clerk is respectfully directed to enter judgment for Defendants Polsteam Shipping Co. and CSC Sugar, LLC, and to terminate this case.

SO ORDERED:

_____/s/_____
PAMELA K. CHEN
United States District Judge

Dated: December 13, 2013
        Brooklyn, New York